LEONARD TEZON, RESPONDENT, v. CHARLES PERKINS, d/b/a PARK
VALLEY STABLES, APPELLANT.—214 S. W. 2d 732.

Kansas City Court of Appeals.   Opinion delivered November 8, 1948.

*James B. Nourse* and *Ted Houx, Jr.,* for appellant.

*H. G. Pope* for respondent.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $250 and defendant has appealed.

Plaintiff testified that on the morning of September 28, 1946 he, together with his wife and daughter, went to the riding stable operated by defendant near Swope Park; that he asked the attendant to rent him two horses and inquired if his daughter could ride with him on one of the horses. The attendant agreed that this might be done. Plaintiff asked that he be furnished a gentle horse on which his daughter and he would ride. Such a horse was furnished.

He further testified that he placed his daughter, who was about 8 or 9 years of age, and weighed between 68 and 70 pounds, in the saddle and that he mounted the horse behind. The saddle was a western type saddle and was built for the use of one person. Plaintiff was sitting "tight against" the saddle, his feet in the stirrups. His daughter's feet were hanging free. He had hold of the reins and horn and was driving the horse. Plaintiff's wife mounted her horse and the three proceeded over the bridle path in Swope Park with a party of five or six other riders, single file. Plaintiff and his daughter were in the rear, his wife immediately in front of him. Another attendant of the defendant went with the party and rode in front of plaintiff's wife. They had been riding for about 30 minutes and were going over a rocky dirt trail. The trail was narrow and slightly uphill. Plaintiff's horse was straining to gain his footing when suddenly the saddle turned on the horse throwing plaintiff and his daughter to the ground. Plaintiff examined the saddle afterwards and found part of the wooden tree had pulled in two for a space of two inches and that the strap which was attached to the part that came loose (evidently the cinch strap) with nails had also come loose. He noticed rusty nails at the broken place in the saddle. The cinch strap also had broken. The saddle did not fall off of the horse but the loosening of the girth caused it to merely turn under the horse.

Plaintiff's wife testified that she saw the broken place in the saddle and that the nails were rusty; that the attendant on the ride kept his eyes on the group and was attentive to them but she did not recall him saying anything during the ride.

Plaintiff glanced at the saddle before he mounted the horse and saw that it appeared to be an old saddle but the part that subsequently broke was covered. He did not make any close inspection of the saddle.

Defendant testified that he remembered the day upon which the accident occurred; that he personally made available the horse and the equipment to plaintiff; that plaintiff asked him if his little girl could ride with him and he replied in the affirmative, assuming she was small enough to be held in the plaintiff's lap on the saddle. He was under the impression that the girl was 2 or 3 years old. He afterwards saw the girl and noticed that she appeared to be about 12 years of age; that he then told plaintiff "if you both could not sit in the saddle she had better take" another horse. "She would be all right." He advised the plaintiff not to ride the horse in the manner the latter proposed; that he did not forbid him to do it because the rider of a horse could use it as he saw fit so long as he did not abuse it. However, plaintiff "seemed to think he could handle it all right."

He further testified that the horse that plaintiff got was a gentle horse, about 15 hands high, about 2½ or 3 years of age and thoroughly dependable; that all the saddles that he used were inspected once a week or oftener; that at the time of renting out a horse and equipment, the cinch, bridle and pad are inspected; that the saddle in question had been used for four or five years and had been inspected once or twice a week during that time; that the horse had been ridden once before that day and that the equipment had been checked that morning. He further testified that he personally examined the saddle on the horse before plaintiff mounted it because he was dubious about the way plaintiff intended to ride; that he tightened the straps, checked the cinch strap, and the connections from the cinch strap to the saddle, the horn, the bridle and the reins. The saddle was placed on the horse and the girth was fastened by the cinch strap which was run through a ring on the girth and a saddle knot made.

Defendant examined the saddle after the accident. He testified that it was not broken in any particular but that the rawhide string with which the saddle was laced had loosened and he gave his opinion as to the cause of this that "riding in that manner, pulling back and forth on the saddle would tend to loosen that slightly", and cause the cinch and girth straps to loosen somewhat, resulting in the saddle turning.

Plaintiff testified that when the horse was straining it was an unusual way for him to ride it as he did.

Defendant's son, testifying for the defendant, stated that he saddled the horse that plaintiff rode about seven o'clock in the morning prior to the time it was ridden by the first rider; that he checked the saddle and equipment, including the horn, the tree, the girth, the cinch straps, the stirrups, the blanket and the cinch ring, and that

he found all of the equipment in good condition; that when the first rider came back he again checked the equipment and everything was all right.

Defendant's witness, Vandenburg testified that he had formerly been in the Remount Service of the U. S. Army and that his duties were to teach riders how to mount and ride horses. In response to a hypothetical question asked by defendant, he gave it as his opinion that the saddle in question would not have slipped had the rider been seated in the saddle at the time.

The case was pleaded, tried and submitted to the jury under the *res ipsa loquitur* doctrine. Defendant complains that the court erred in failing to sustain his motion for a directed verdict and in submitting the case under the *res ipsa loquitur* doctrine.

In general the doctrine does not apply except (1) when the occurrence resulting in injury is such that does not ordinarily happen if those in charge use due care; (2) the instrumentalities involved were under the management and control of the defendant; (3) the defendant possesses superior knowledge or means of information as to the cause of the occurrence. The requirement that the instrumentality be under the management and control of the defendant does not mean, or is not limited to, actual physical control, but refers rather to the right of control at the time the negligence is committed. (McCloskey v. Koplar, 46 S. W. (2d) 557, 559, 560.)

Defendant complains that the evidence does not show an occurrence that does not ordinarily happen if the one in charge used due care, and that the instrumentality, that is the saddle, was not under the management and control of the defendant, but was under the control of the plaintiff at the time of the accident. We think these contentions must be sustained.

The horse was going uphill and was straining for its footing at the time of the accident. The saddle slipped. An incident of this kind might have been caused by a number of things. It might not have been caused by a discoverable defect, but the manner in which plaintiff was riding. The saddle may have worked back and forth causing the straps to work loose. The saddle could have broken because there was too much strain on it. Plaintiff's daughter weighing between 68 and 70 pounds was seated in the saddle. Plaintiff was seated behind the saddle with his feet extended forward into the stirrups, with his hand on the horn. The horse exerted a certain amount of strength when straining in climbing an uphill grade. The straining of the horse under such circumstances as this might have caused the straps to become loose. In addition to this the saddle was not in the control of the defendant but was in the exclusive control of the plaintiff. He testified that he had full control of the horse, saddle and bridle at the time.

The evidence shows that plaintiff had been riding the horse for at least 30 minutes. Defendant testified that the horse had been ridden four miles, and there is no contradiction of this testimony. The horse had been ridden for sometime and for some distance without any untoward occurrence.

Plaintiff contends that the horse was not in his control but in the control of the attendant. There is no evidence to support this contention, unless the mere fact that there was an attendant in charge of the party showed that the latter was in control. There is no evidence to indicate that the attendant made any statement or remark concerning the saddle during the whole time it was being used by plaintiff and his daughter. There is no question that the horse and saddle were in the exclusive control of the plaintiff, as he, himself, testified.

It is claimed by the plaintiff that, in the answer, the defendant admitted that the saddle, bridle and equipment were owned and maintained by the defendant; that they were maintained under the supervision of the defendant.

An examination of the answer shows that it was pleaded therein that these things were under the general supervision and control of the defendant, but it goes on to state that at the time of the accident they were under the supervision and control of the plaintiff.

We are of the opinion that this is not a *res ipsa loquitur* case. We have examined the authorities cited by the plaintiff and find them of no aid to him.

The judgment is reversed and the cause remanded. All concur.